THE PRESIDENT, DIRECTORS, and COMPANY of the PLANTERS BANK OF MISSISSIPPI *v.* JEREMIAH WATSON and another.

APPEAL from the District Court of Concordia, *Curry*, J.

*A. N.* and *O. N. Ogden*, for the appellants.

*Stacy, Sparrow, Dunbar, Hyams* and *Elgee*, for the defendants.

GARLAND, J.   A judgment in this case was rendered at a previous term of the court, in favor of the plaintiffs and appellants, and a re-hearing granted, pending which the parties have transacted in relation to, and compromised their differences; by which, among other things, it is agreed that this suit shall be dismissed both in the court below and in this court, the plaintiffs having acknowledged to have received full satisfaction for all the liabilities of said defendant, for the claims set up against him in this suit, as appears by the act of compromise filed in the record.

*Appeal dismissed.**

---

* This case was argued before the Supreme Court at Alexandria, in October, 1842, when it was agreed between the counsel of the parties, that the decree might be rendered after the adjournment of the court, and entered on its minutes at any time before the 1st of January, 1843, and that a rehearing might be applied for within sixty days from that day. A decision was accordingly rendered, and the defendants applied for a rehearing, which was granted " as to the question of prescription only." While suspended under this application, the agreement was entered into between the parties, in pursuance of which the suit was dismissed. The great importance of the questions investigated in the opinion of the court delivered by SIMON, J, renders it of too much interest to be altogether omitted in the Reports. This opinion was concurred in by all the judges present on the argument of the case; and, though a rehearing was granted as to one point, there is no reason to believe, had the case not been compromised, that the opinion would have been changed.

SIMON, J. This is a revocatory action, founded upon allegations of fraud and simulation. The magnitude of the amount involved in the controversy, and the strict appli-

cation of the legal principles which we are about to recognize, render this case one of considerable importance. It has been ably and elaborately argued on both sides, and before coming to the conclusion which we have adopted as the basis of the judgment which we have to pronounce, we have not failed to bestow upon it the most intense consideration.

The history of this case is this: On the third of February, 1835, a certain note of $20,000, endorsed by the defendant, Watson, as third endorser, became due at the Planters Bank of Mississippi, at Port Gibson, and was duly protested. On the second of May, 1836, two other notes amounting together to $118,304 06, on one of which said Watson was first endorser, and second endorser on the other, fell due at the office of the Bank of the United States, at Natchez, and were also duly protested. In July, 1836, a suit was instituted by the plaintiffs against Watson, on the note of $20,000, before the District Court of the Third District of the State of Mississippi, from which there resulted a judgment in favor of the plaintiffs, which was rendered and made final on the 27th of May, 1840, for the sum of $28,533 33. On the 7th of June, 1836, another suit had been instituted by the plaintiffs against Watson on the two other notes, amounting together to $118,304 06, before the same court, in which a judgment having been rendered in favor of the defendant, an appeal was taken to the High Court of Errors and Appeals of the State of Mississippi, whereupon the judgment appealed from was reversed, and final judgment rendered in favor of the plaintiffs, against Watson, in January, 1840, for the sum of $133,871 38. The certificate of this judgment was not filed in the lower court, until the 28th of May, 1840.

On the 14th of December, 1837, during the pendency of the two suits above mentioned, the defendant Watson conveyed to the defendant Walker, his son-in-law, residing in the State of Arkansas, all his, Watson's, property, situated in the parish of Concordia, consisting in large tracts of land, and a great number of slaves, &c., including therein four hundred bales of cotton ready for market, for and in consideration of $280,000, divided in nine promissory notes, payable to the order of Watson ; the first for $20,000, to be paid on the 25th of March, 1838, and the others in eight equal annual instalments, from the 1st of January, 1838, and bearing ten per cent interest after maturity, until paid. Watson's wife intervened in the act of sale for the purpose of renouncing her legal mortgage on the property sold, and certain mortgages, amounting to the sum of $90,710 39, exclusive of interest, were declared to exist on said property ; and the act was accepted by the vendee, with the promise on the part of the vendor, to assume said mortgages, and to guaranty the vendee from the payment thereof.

On the same day that the sale was executed, a notarial act of procuration was passed by Walker to Watson, in which the latter was appointed and constituted his son-in-law's general and special agent and attorney in fact, for the term of one year, giving him the fullest and most extensive powers on the property which had just been conveyed, even authorizing him to sell and buy, to draw and endorse notes and bills of exchange, to employ and dismiss overseers at his pleasure, &c ; agreeing to pay to the said Watson, a compensation of $1,500, at the termination of the twelve months, and to furnish him and his family with the use of the dwelling house on the plantation just conveyed ; in consequence whereof, the vendor, as the agent of the vendee, continued to remain in possession of the plantation, slaves, and other property, and to

administer them as if they still belonged to him. There is no evidence that this procuration was ever renewed, or the time extended by any subsequent act.

On the 20th February, 1841, due proceedings were had, and applications were made by the plaintiffs to the judge of the Ninth District of Louisiana, to render the above mentioned two judgments executory under our laws, whereupon it was ordered and decreed that said judgments be executed, and that executory process issue according to the prayers of the plaintiffs' petitions. Writs of seizure and sale were accordingly sued out, and put in the hands of the sheriff of the parish of Concordia, who stated, in his return, that, after diligent search and inquiry being made, and no property found in his parish, belonging to the defendant Watson, whereon to levy the writs, he returned them, *nulla bona*.

The plaintiffs having thus unsuccessfully attempted to obtain satisfaction of their judgments, instituted the present action, in which, on divers allegations of fraud and simulation, made against both the vendor and vendee, they seek to annul and set aside, as fraudulent and simulated, the conveyance executed by Watson to Walker. They pray that the said pretended sale be, as to its effect upon the rights of the petitioners, avoided, rescinded, and annulled; that the property be made subject to be seized and sold to satisfy their judgments; and that, in the mean time, Watson be enjoined from parting with the notes given by Walker, and from disposing of them in any manner until the final decision of the suit.

Watson joined issue by denying the allegations contained in the petition, admitting the sale made by him to Walker, and further alleging that the same was made in good faith and for a just price.

Walker, to whom a curator *ad hoc* had been appointed, appeared voluntarily, and filed a long answer, in which he undertakes to plead usury, and other matters in avoidance of the plaintiffs' demands in their two original actions against Watson in the State of Mississippi, attempting thereby to show that the two judgments rendered there, and on which the present action is based, were unjust and illegal. He further pleads, that the sale attacked by the plaintiffs, was made in good faith, and for a valuable consideration; that he has been in possession of the property conveyed since the date of the sale; that he is not a citizen or resident of the State of Louisiana; and that he possesses his property here by his agents, overseers, and managers. He further avers, that he always held possession of the property purchased, by means of his agent, Watson; that the consideration stipulated in the sale, is not fictitious; that a part thereof has already been paid; and that he will pay the balance so soon as plaintiffs shall cease to disturb and slander his title; and, assuming the character of plaintiff, he complains of this suit as having being brought with the design of oppressing and harrassing him, and reconvenes the plaintiffs' demand, by claiming damages to the amount of $5000, for counsel's fees, personal expenses, loss of time, &c. This answer contains also the plea of prescription of one, two and three years; and concludes by praying for judgment against plaintiffs for the sum of five thousand dollars.

The defendant, Walker, subsequently withdrew his plea of usury against the original cause of action, and admitted the validity of the judgments rendered against Watson.

The cause was submitted to a jury, who returned a verdict in favor of the defendants. Judgment was rendered thereon accordingly; and, after an unsuccessful attempt to obtain a new trial, the plaintiffs took the present appeal.

Without undertaking to give here a detailed statement of the voluminous evidence contained in the record, it will perhaps suffice to review, or recapitulate the most important and striking facts, disclosed by the testimony adduced on the trial of this cause before the jury. The record shows, that at the time of the sale from Watson to Walker, Watson's debts and liabilities amounted to, at least, $400,000. Those debts and liabilities consisted of the amount of the mortgages declared in the act of sale ; the notes of hand on which suits were then pending against him in the courts of the State of Mississippi, and the amount whereof is the subject of this action ; his endorsement on a note of $124,000, filed in a suit yet pending against him in the parish of Concordia ; and several other large sums for which Watson had been sued in the parish of Concordia, and on some of which judgments were subsequently rendered against him. All the property he possessed was sold for $280,000, and the same is shown to have been appraised, in 1836, at $170,000 or 180,000, cash.

It is not our intention to comment much on the evidence, but we cannot forbear remarking, that the facts relative to Watson's indebtedness go to show that he must have considered himself, at the time of the sale, as he really was, in insolvent circumstances; and although judgments were not yet rendered against him on his said debts and liabilities, it is not surprising that, in the expectation of those judgments, he attempted, by the sale in question, to screen his property from the pursuit of his creditors. Several witnesses state that previous to the sale they heard him say that he would never pay the debt claimed, unless the other endorsers would pay their parts ; that otherwise, he would dispose of his property in such a manner that they would not get a cent. Other witnesses testify, that previous to the sale, they had heard a good deal spoken of Watson's endorsing for Dart, and Stedman & Co., and that this was a matter of *general notoriety*. Watson's state of insolvency was undoubtedly known to his son-in-law, Walker, who alleges, in his answer, that Watson was put in jail, at the time, for those debts.

In December, 1837, whilst he was litigating with the plaintiffs and with others, he sells *the whole* of his property, at long credits, to his son-in-law, and includes in the sale 400 bales of cotton, which he could have sent to market ; on the same day, he is appointed the agent of his vendee, and sole manager of the property ; he remains in possession of it, and although his power of attorney was limited to one year, he continues to keep his possession until the present time. This subsequent possession is not explained, nor in any manner accounted for ; and a witness states that he has been frequently at Watson's since the sale, and never saw Walker there. It is true, it is shown that the property was assessed and the taxes paid in the name of Walker ; but this was the act of Watson himself, who went even so far as to include in the assessment a four-wheeled carriage, which had not been sold. The notes given by Walker were placed in the hands of the witness, Briscoe, for safe keeping ; they remained there nearly twelve months ; were sent for at different times ; and only one of them remained in the witness's possession, which Watson had endorsed to him, to secure him against a liability for said Watson. What became of all the notes taken by Watson for the amount of the price of his property, is a question unanswered by the record ; and yet he pretends that the plaintiffs ought to have exercised their recourse against said notes, and not against the property. The deputy sheriff testifies, that he frequently called upon Watson to point out property to be levied on, and that Watson told him he had 25 or 30 head of cattle. Another witness, who lives about three miles

from the plantation, states that he saw Walker once on the place, but supposed it to be on a visit, and that Watson has always taken the same interest in the plantation that he did before the sale. In March, 1840, Walker and wife conveyed a tract of land to Scott Watson, for the sum of $26,900, out of which, $12,185, were applied to the payment of a judgment rendered against the defendant Watson, and the balance was paid in promissory notes, payable to the order of Walker, and secured by mortgage on the property sold. It is true the payment made out of the price of this property, was in satisfaction of one of the mortgages declared in the sale; but that shows that Walker was paying Watson's private debts, with the proceeds of the sale of the same property to him conveyed by Watson.

Now, in connection with the above facts and circumstances, which, in our opinion, amount, at least, to strong presumptive evidence that the contract of sale between Watson and Walker, was not real, that it was fictitious and simulated, let us enquire into the means which the defendants had in their power, to show that the sale was made in good faith. If Walker was really the owner, and Watson the agent, it would have been easy to prove the accounts rendered by the agent to his principal, or to adduce evidence that such accounts existed, and had been rendered. Why was not evidence offered, to establish the manner in which the revenues of the plantation were used and appropriated?—to show who received the proceeds of the crops? Those crops were perhaps sold by commission merchants in New-Orleans, who paid the proceeds thereof to some one whom they considered the owner. Why was it not shown that said proceeds were paid over to Walker? How is it that Watson's continued possession is not accounted for, in any other manner but by the production of a power of attorney, which was only to have effect during one year? What was the cause of Walker's continued absence from his estate in Louisiana? True, he resided in Arkansas ; but, however distant the property may be from the residence of the owner, it is not natural, and it seems even extraordinary, that the owner should neglect such an immense estate, and not visit it, even once a year, to ascertain how, and in what manner it is administered. In whose name was the cotton crop sent to market? Who were the consignees, or commission merchants, charged to sell it? What became of the proceeds thereof? These are questions which stand unanswered by the defendants; and, being matters which it was in their power to disclose, we are induced to conclude that their not disclosing them, must have the effect of strengthening the presumption, that Watson never ceased to be the owner of the property by him conveyed to his co-defendant and son-in-law, Walker.

This action is based upon arts. 1903, 1904 and 1905 *et seq.* of the Civil Code, in which our law establishes the principles, that "the property of the debtor shall be liable for all the consequences attending his non-performance of his obligations," and that " every act done by a debtor, with the intent of depriving his creditor of the eventual right he has upon the property of such debtor, is illegal, and ought, as respects such creditor, to be avoided." Among the different acts which are often resorted to by a debtor to injure his creditors, and deprive them of their recourse against his property, is the fraudulent and simulated sale or other alienation of the property he possesses. When such sale is made in fraud of the rights of creditors, it is first necessary to consider if the thing sold has remained in the possession of the seller, or if it has been delivered to the purchaser. If the property sold remains in the possession of the vendor, because he retains it *by a precarious title,* article 2456 of the Civil Code, informs us,

that " *there is reason to presume that the sale is simulated,* and with respect to third persons, *the parties must produce proof that they are acting in good faith,* and *establish the reality of the sale.*" So it is also under article 1915, which says, in positive terms, that the vendor's remaining in possession of the property sold, will be considered as a *mark of fraud,* and will throw the burthen of proving that the contract was made, *bona fide, upon him to whom the property was transferred,* in any controversy with creditors, &c." So in the case of *Thibodeaux* vs. *Thomasson,* 17 La., 306, we said that, when the thing sold remains in the possession of the seller, *who is suffered to act as owner,* the rule that the delivery of immoveables always accompanies the public act which transfers the property, ceases to be applicable, and the sale is presumed to be simulated and fraudulent. 6 Mart. N. S., 640. 4 La., 340. 6 La., 538. Applying the law above quoted to the facts presented in the case under consideration, we must say that Watson's possession was *by a precarious title* (Civil Code, art. 3522, sect. 27. Delaporte, Traité des Prescriptions, ch. 8, tit. Precaire, p. 62); and that it was his duty, as well as Walker's to establish the reality of the sale, by showing that they acted in good faith; nay, by the terms of article 1915, the *onus probandi* is thrown particularly upon Walker, to show that the contract was made *bona fide.* Now, have they adduced any proof to destroy the presumption of fraud and simulation, arising from the fact of possession in Watson after the sale ? Does the record contain any evidence sufficient to counteract the effect of this presumption? This question must be answered in the negative. Hence it will follow, that, strengthened by all the other circumstances of the case, this legal presumption must amount to sufficient evidence that the sale from Watson to Walker, at a time when the vendor was in apparently insolvent circumstances, and threatened with heavy judgments which were subsequently rendered against him, was fictitious and simulated.

The position which we have taken in the decision of this cause, precludes, perhaps, the necessity of enquiring into the extent of the maxim, relied on by the defendant, *that fraud is not to be presumed,* as applicable to the present case. This maxim means nothing more, than that it must be proved, like any other allegation; but its existence may be established by simple presumptions, *by legal presumptions,* as well as by other evidence. Civil Code, art. 1842. In this case, the alleged fraud is shown by the very acts of the parties, corroborated by other strong circumstances, which acts and circumstances come within the meaning of art. 1843 of the Civil Code, which declares that certain circumstances and acts attending particular contracts, are, by law, declared to be conclusive, and others, presumptive evidence of fraud.

It has been urged that, admitting fraud in Watson, it is further necessary to *bring home knowledge* to Walker; and that, to set aside an alienation for fraud, three things must be proved: fraud on the part of the vendor, *knowledge of that fraud by the vendee,* and actual injury to the creditors. This would be true in those revocatory actions which the law authorizes the creditors of an insolvent to bring against the alienations made by their debtor to their prejudice, either by giving an undue preference to one of the other creditors, or by putting the property out of their reach, when possession in the vendee has followed the fraudulent act; but in this case, the act is attacked as fictitious and simulated, from the fact that the property sold remained in the vendor's possession, which possession is, of itself, in the sense of the law, *a badge of fraud.* In such a case, how can the vendee be separated from the vendor ?

How could the vendee be in good faith, and the vendor alone guilty of fraud? If the sale is fictitious and simulated, can it be considered so only with regard to the seller, and be taken as serious and *bona fide* with respect to the purchaser? Is not the fact that the latter did not take possession of the property sold, and suffered the vendor to keep it, sufficient to authorize the presumption, in the legal sense of the word, that he knew that the sale was simulated? And could the simulation exist under such circumstances, without his knowing it? No: our law has very wisely said, that the presumption of fraud and simulation should apply to both; and the only way to repel such presumption, is the proof to be made *by the parties*, and particularly *by the vendee*, that the act was made in good faith; and again, it is required, that *they should establish the reality* of the sale. Civil Code, arts. 1915, 2456. This we consider as an exception to the general rules which govern in cases of revocatory actions, that is to say, that instead of the *onus probandi* being thrown upon the plaintiff, to establish the fraud, and knowledge of fraud in the vendee, it is made here the duty of the defendants to prove their good faith and the reality of the transaction, in order to destroy the legal presumption which arises from their act. It is, nevertheless, true, that in all cases, the three conditions recognised by our jurisprudence must concur; and the difference here is, only as to the manner of establishing them. In other ordinary cases, the two first conditions must be proved; in the present case, they are presumed to exist. 10 Mart· 605. 6 La. 538. 9 La. 170. 10 Duranton, No. 586.

With regard to the third condition—an actual injury to the suing creditor, *eventus damni.* It cannot be pretended that this has not been satisfactorily established. The return of the sheriff shows, that Watson had no property on which the writs could be levied. He himself pointed out 25 or 30 head of cattle, as the only property he possessed; and if he had really intended that Walker's notes should have stood in lieu of the property by him sold, it was his duty to deliver them to the sheriff, in order that he might have levied his writs upon the said notes. This objection comes rather with bad grace on the part of Watson, who, during the progress of the suit, moved the court to dissolve the injunction, and thereby recognised that he had Walker's notes in his possession, and that he wished to be able to dispose of them. Again, if he had those notes, he ought to have delivered them to the sheriff; not having done so, the presumption is, that they were kept for some unfair purpose, or that they were not really due. It is clear that negotiable notes, from their nature, cannot be seized but with the greatest difficulty, and after being ascertained that they are yet in the hands of the payee. If he has parted with them, it is obvious the remedy of the creditor is lost, unless he can show that they were fraudulently transferred to others, who participated in the fraud. The plaintiffs were not obliged to resort to those extraordinary means. It was sufficient that Watson did not give them up to the sheriff, when called upon to point out his property, to authorize them to conclude that they were not in his possession. 6 Toullier, Nos. 348, 351.

From all the facts and circumstances disclosed by the record, and particularly from the fact that the vendor remained, after the sale, in possession of the property sold, without any interference or control shown to have been exercised by the vendee, we do not hesitate to say, that the sale attacked in this suit, is fraudulent and simulated, and that it ought to be avoided and set aside.

Under this view of the case, it becomes our solemn duty to declare the verdict of the

jury manifestly erroneous; and, although the principal question presented in this case is one of fraud and simulation, as its solution depends as much upon a proper application of the law as upon the facts established by the evidence, it is not astonishing that the jury may have been misled into the belief, that the sale complained of was valid and binding on all parties, and that the plaintiffs' remedy, to obtain the satisfaction of their judgments, was only against the notes given by Walker for the price of his purchase. However it is, all the evidence being before us, we feel bound to decide on the facts as well as on the law, and to render such judgment as should have been rendered in the court below. Code of Practice, art. 905. 10 Mart., 651. 11 Mart., 188. 11 La., 303. And see *Hosea's widow and Heirs* v. *Miles* (13 La., 110), in which this court said, that "as it possesses the right, and is under the obligation of examining questions of fact as well as those of law, and as it is not provided with a jury, it follows that it may become its duty to pronounce on a question of fact, in direct opposition to the verdict of the jury; otherwise, there might be cases in which suitors could not be relieved in this court, from erroneous decisions below." In this case, no doubt, existing in our minds, we are unable to see any necessity for remanding the case, for a new trial before another jury.

There remains now the question of prescription. It is one of great importance and difficulty, and the conclusion which we have come to, on this subject, is the result of our best and most mature deliberations. We must candidly confess, however, that the decision which we have adopted, is not free, even in our own minds, from objections, but we have thought it more consonant with the true principles of real justice and moral equity.

The prescription of one year, introduced in our law by articles 1982 and 1989 of our Civil Code, which last article is in these words: "the action given by this section, (the revocatory action,) is limited to one year; if brought by a creditor individually, to be counted *from the time he has obtained judgment* against the debtor; if brought by syndics, or other representatives of the creditors collectively, to be counted from the day of their appointment," has its origin in the Roman law. Under that system, the revocatory action, called *actio Pauliana*, was prescribed by the lapse of one year from the time *that the creditor could act;* but, in general, from the day of the *alienation*. Pandects. B. 42, tit. 9; law 6, sect. 14; law 10, sect. 18. Toullier, vol. 6, No. 356. Duranton informs us, (vol. 10th, No. 584,) that "l'année ne commençait pas à courir du jour des actes ou aliénations, màis seulement du jour où *les créanciers avaient pu agir*, c'est-à-dire, à partir de la discussion des biens du débiteur, qui avoit suivi l'envoi en possession de ces mêmes biens en faveur des créanciers; car anparavant l'on ne pouvait savoir s'il avait ou non dans son patrimoine de quoi satisfaire à ses obligations, &c.," This prescription against revocatory actions, has been modified by our Code, which, under the article 1982, makes it run from the day of the alienation, when its object is only to give an undue preference to one creditor over the others; and under article 1989, above recited, from the time the creditor has obtained judgment against his debtor, when the act of the latter is attacked as fraudulent, and indicates something more than a bare pretence accorded to one of his creditors. 3 La. 28. 11 La. 424. 16 La. 108. This last prescription is the one applicable to the present case.

The question occurs, therefore, whether the word "judgment" used in the above article, is to be construed in reference to all judgments which may be obtained here,

or in any of the other States of the Union, although the latter cannot be executed without a special order or judgment obtained from one of our courts; or whether its application is to be restrained to such judgments as may be obtained in Louisiana? Or, in other words, does the law refer to any other judgments but those which may be rendered in this State?

This question bears only on the judgment which was rendered in favor of the plaintiffs, by the High Court of Errors and Appeals of the State of Mississippi, in January, 1840; for, as to the other, obtained in May, 1840, as this suit was brought in April, 1841, no prescription could be acquired.

It is clear under article 3294 of the Civil Code, that a judicial mortgage does not result from the recording of a judgment rendered in another State of the Union, unless its execution has been ordered by a tribunal of this State, in the manner prescribed by law. The manner is pointed out in article 746 of the Code of Practice, which refers to article 734 and other preceding articles; but if the judgment sought to be made executory, has been rendered by default, or on attachment, the creditor cannot proceed by executory process, but must adopt the ordinary mode, which is to institute a new action, and obtain a new judgment. Code of Practice, art. 747. It is obvious, therefore, that from the very provisions of our laws, no legal right results on the property of a debtor, in favor of his creditor, from the judgment which he may have obtained in another State, unless it is made executory by an order, or second judgment obtained from one of our courts; and that *by itself*, though having the force of *res judicata*, such judgment does not amount here to any thing more than the proof, or evidence of the creditor's claim, upon which he may obtain a judgment either in the executory or ordinary mode from one of our tribunals. Code of Practice, art. 752. As long as the creditor has not applied for, and obtained this executory process, he cannot acquire any lien on his debtor's property, and he is precluded from enjoying the rights and privileges allowed by our laws to ordinary judgment creditors. He stands, perhaps, in a worse situation than a mortgage creditor, who, under our laws, is in possession of an act importing a confession of judgment, and who does not act upon it; for, he has not, and cannot even acquire any judicial mortgage to secure his claim, and is not permitted to act thereon, until he resorts to our judicial proceedings.

On the other hand, a judgment obtained here, after it has acquired the force of *res judicata*, is subject to no further dispute or litigation. When once rendered, it becomes the property of him in whose favor it was given. Code of Practice, art. 548. If recorded, the judicial mortgage resulting therefrom, takes effect from the day on which it was pronounced. Civil Code, art. 3290. It can be executed, whenever the creditor thinks proper, by a mere application made to the clerk for a writ of *fieri facias*. Code of Practice, art. 641.

There is, in our opinion, a vast difference between the effect of a judgment obtained here, and one rendered in another State; and it seems to us, that it would be unjust, if not impolitic, to extend the prescription under consideration to any other judgments, but those, which, having been rendered in this State, are sufficient *in themselves* to entitle the creditors to the immediate rights and advantages which are derived from the provisions of our law. We are not prepared to say, that the intention of our legislature was carried beyond the judgments rendered in our courts; and we, therefore, conclude, that the judgment in question cannot be considered as a judgment, in the

---

sense of article 1989, except from the time that, by a special order, or judgment of the court of the Ninth Judicial District, the same was made executory.

We think that the plea of prescription relied on by the appellees, must be disregarded.

It is, therefore, ordered, that the judgment of the District Court be annulled, and reversed; that the sale attacked in this suit, be avoided, annulled and set aside, as fraudulent and simulated, as to its effects upon the rights of the plaintiffs; that the property conveyed, remain subject to be seized and sold to satisfy their judgments, (subject to the credit of $24,940, heretofore paid to the plaintiffs out of the proceeds of the sale of Dart's lands,) as if no sale thereof had ever been made; and that the defendants and appellees pay the costs in both courts.